NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**LISA AFOLAYAN, WIDOW OF NATHANIEL AFOLAYAN, DECEASED, ON BEHALF OF HERSELF AND HER TWO MINOR DAUGHTERS,**
*Petitioner*

**v.**

**DEPARTMENT OF JUSTICE,**
*Respondent*

---

2021-1452

---

Petition for review of a decision of the Bureau of Justice Assistance in PSOB Claim No. 2010-022.

---

Decided:  April 15, 2022

---

KYLE LYONS-BURKE, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for petitioner.  Also represented by JOHN PATRICK ELWOOD.

GEOFFREY MARTIN LONG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by BRIAN M. BOYNTON, MARTIN F. HOCKEY, JR., TARA K. HOGAN; JASON P. COOLEY, RAFAEL ALBERTO

MADAN, Office of the General Counsel, Office of Justice Programs, United States Department of Justice, Washington, DC.

—————————————

Before NEWMAN, DYK, and HUGHES, *Circuit Judges.*

DYK, *Circuit Judge.*

On April 30, 2009, Agent Nathaniel Afolayan collapsed after completing a mandatory training run at the Border Patrol Academy in Artesia, New Mexico. A day later, he died. His widow, Lisa Afolayan, appeals from the Bureau of Justice Assistance's ("Bureau's") denial of death benefits under the Public Safety Officers' Benefits Act ("PSOBA" or "Benefits Act"). 34 U.S.C. § 10281. We *vacate* the decision and *remand* for further proceedings consistent with this opinion.

## BACKGROUND

Under the Benefits Act, when the Bureau determines that "a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty," the Bureau must pay a death benefit to the surviving family of the officer. § 10281(a). The Bureau is authorized to "establish such rules, regulations, and procedures as may be necessary" to administer the death and disability benefits under the Benefits Act. § 10285(a).

The regulations define "injury" to include "a traumatic physical wound (or a traumatized physical condition of the body) directly and proximately caused by external force (such as bullets, explosives, sharp instruments, blunt objects, or physical blows), chemicals, electricity, *climatic conditions*, infectious disease, radiation, virus, or bacteria." 28 C.F.R. § 32.3 (emphasis added). The definition of "injury" excludes "[a]ny occupational disease" or "[a]ny condition of the body caused or occasioned by stress or strain." *Id.* Under the current regulations, a death "results directly

and proximately from an injury if the injury is a *substantial factor* in bringing it about." *Id.* (emphasis added).  The regulations use the word "factor" to describe the type of injury covered.  A factor "substantially brings about a death" if the factor "alone was sufficient to have caused the death" or "[n]o other factor (or combination of factors) contributed to the death . . . to so great a degree as it did." *Id.*  The key questions here concern whether "a traumatized physical condition of the body" was "directly and proximately caused by . . . climatic conditions" and whether this injury was a "substantial factor in bringing [Agent Afolayan's death] about."

At the time of his death, Agent Afolayan was in the last week of a twelve-week training program at the Border Patrol Academy in Artesia, New Mexico.  At approximately 2:45 p.m. on April 30, 2009, Agent Afolayan and other agents-in-training performed their final physical-fitness test, which included a one-and-a-half mile run to be completed in thirteen minutes or less.  The run took place at approximately 3,400 feet above sea level, with the temperature at approximately 88 degrees Fahrenheit and relative humidity between six and seven percent.  After completing the run in eleven minutes and six seconds, Agent Afolayan indicated that he did not feel well and thereafter collapsed.  He was initially brought to the Border Patrol Academy's Health Unit for medical assistance.  As his condition declined, he was taken first to Artesia General Hospital, then to Covenant Medical Center in Lubbock, Texas.  Agent Afolayan died at 10:41 p.m. the next day.  His death certificate, as amended in September 2009, listed the immediate cause of death as "Heat Illness" and identified "cardiomegaly (cardiac disease)" as an "other significant condition[] contributing to death."  The meaning of the death certificate is less than clear.

Approximately two years before his death, Agent Afolayan had obtained genetic testing which revealed that he was a carrier of sickle cell trait.  Sickle cell trait "is not

a disease, but having it means that a person has inherited the sickle cell gene from one of his or her parents." Centers for Disease Control and Prevention, *What You Should Know About Sickle Cell Trait,* https://www.cdc.gov/ncbddd/sicklecell/documents/scd%20f actsheet_sickle%20cell%20trait.pdf. Sickle cell trait affects approximately one in twelve African Americans in the United States, though most people with the trait usually do not have any symptoms of sickle cell disease and live a normal life. *Id.* In rare cases, people with the trait "might experience complications of [sickle cell disease, i.e., a sickle cell crisis] . . . and, in extreme circumstances, sudden death." *Id.* In a sickle cell crisis, "the different organs throughout the body, including the brain and the heart and muscles, all start to be deprived of oxygen because the blood is clogged up by the sickle cells and not flowing freely." J.A. 161. "In their extreme form and in rare cases," conditions that could be harmful for people with sickle cell trait include "[l]ow oxygen levels in the air (e.g., when mountain climbing, exercising extremely hard in military boot camp, or training for an athletic competition)[,]" "[d]ehydration," and "[h]igh altitudes (e.g., flying, mountain climbing, or visiting a city at a high altitude)." *Id.*

Ms. Afolayan filed a claim for death benefits under the Benefits Act in October 2009, relying on the death certificate listing "Heat Illness" as the cause of death. The Bureau denied her claim in March 2012. Ms. Afolayan appealed this denial and requested a determination of her claim by an independent hearing officer. The hearing officer denied Ms. Afolayan's appeal in January 2014. In February 2019, Ms. Afolayan appealed the hearing officer's determination to the Bureau's Director.[1] In September

---

[1]   The appeal to the Director, which would otherwise have been out-of-time, was accepted after Ms. Afolayan provided good cause for extending the filing deadline.

2020, the Acting Director of the Bureau denied Ms. Afolayan's appeal, concluding from the medical evidence in the record that "Agent Afolayan died—not from a wound or condition shown to have itself been 'the direct and proximate result' of climatic conditions, such as heat, or another external force/factor cognizable as an 'injury' under PSOB[A] regulations—but, rather, as a result of several factors acting together, including physical exertion, sickle cell trait, heat, altitude, and dehydration." J.A. 1. As a consequence, the Acting Director concluded that Ms. Afolayan failed to "establish[] that Agent Afolayan suffered an 'injury' within the meaning of [the Benefits Act] and its implementing regulations." J.A. 21. Ms. Afolayan appeals. We have jurisdiction under 34 U.S.C. § 10287.

## DISCUSSION

We review the Bureau's denial of a claim for death benefits for: "(1) whether there has been substantial compliance with statutory requirements and provisions of implementing regulations; (2) whether there has been any arbitrary or capricious action on the part of the government officials involved; and (3) whether substantial evidence supports the decision denying the claim." *Amber-Messick v. United States*, 483 F.3d 1316, 1321 (Fed. Cir. 2007).

The Bureau contends that under the regulations, it was entitled to consider whether sickle cell trait contributed to Agent Afolayan's death more than any other factor and that the Acting Director properly concluded that "the medical evidence failed to persuade him that climatic conditions contributed to Agent Afolayan's sickle cell crisis as much as, or more than, other factors." Gov't Br. at 16. Ms. Afolayan argues that the Acting Director erred by considering Agent Afolayan's sickle cell trait as a factor in denying her claim because it was a "benign condition" that did not cause his death. Afolayan Br. at 38. Though we do not agree with Ms. Afolayan in all respects, we agree with her

ultimate conclusion that the Acting Director's decision must be set aside.

## I

The statute and regulations require that a cognizable "injury" be the "direct and proximate" cause of death as a condition for recovery.  For present purposes, this requires that climatic conditions be a contributing factor and that "[n]o other factor (or combination of factors) contributed . . . to so great a degree as it did."  28 C.F.R. § 32.3.[2]  The first questions here are whether the Bureau made a determination that climatic conditions were such an injury (or factor) that could support recovery if it were the predominant factor and what the relevant standard is for making that determination.  The Bureau's decision is less than clear as to whether the climatic conditions qualified as a direct and proximate cause if they were the predominant factor.  At the end of the day, it appears that the Bureau skipped straight to concluding that Agent Afolayan's death was not "the direct and proximate result" of climatic conditions

---

[2]    The regulations state:

*Substantial factor* - A factor substantially brings about a death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke if -

> (1) The factor alone was sufficient to have caused the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke; or

> (2) No other factor (or combination of factors) contributed to the death, injury, disability, wound, condition, cardiac-event, heart attack, or stroke to so great a degree as it did.

28 C.F.R. § 32.3.  Only the second test is at issue here.

because several factors, including sickle cell trait, "act[ed] together" to cause his death and that Ms. Afolayan therefore failed to "establish[] that Agent Afolayan suffered an 'injury' within the meaning of [the Benefits Act] and its implementing regulations." J.A. 1, 21.

This approach is not consistent with the statute or regulations. The Bureau should first address a predicate question—whether Agent Afolayan suffered a compensable injury as a result of "climatic conditions." In making that determination, the government appears to take the view that the climatic conditions must be unusual. The experts, including the government's, characterized the conditions as "adverse" or "unfavorable." J.A. 111, 300. The hearing officer found that "while the temperature was what many might consider 'hot,' it was not extremely hot or extraordinarily hot." J.A. 287. The Bureau, however, elided this question in the final determination on appeal.

While we express no view as to the correctness of the hearing officer's determination that the climactic conditions were not extreme, we think that the Bureau's approach to the standard by which to make this determination is generally correct in requiring that conditions be unusual. The reference to "climatic conditions" in the regulations refers to nonroutine "climatic conditions," that is, conditions different from the typical conditions prevailing in the work environment. This would here include heat, humidity, and altitude.

Congress created the death benefit at issue in the Benefits Act in 1976. The Senate Judiciary Committee initially reported a bill providing a death benefit to the survivors of a public safety officer whose death was "in the line of duty from injuries directly and proximately caused by a criminal act or an apparent criminal act." S. Rep. No. 94-816, at 3 (1976). An amendment was offered on the Senate floor substituting "as the direct and proximate result of a personal injury sustained in the line of duty" for the narrower

"criminal act" language.  122 Cong. Rec. 22,643 (1976).  In support of the amendment, which was ultimately accepted, the bill's sponsor clarified that the benefit "is not health insurance; but it does provide for payment if an officer is killed in the line of duty, either by accident or by willful assault by a criminal."  *Id.* at 22,644–45.

In adopting the rules implementing the Benefits Act, the Bureau's predecessor ("LEAA") noted that "the definition of 'personal injury' in the House Judiciary Committee Reports [to include 'all injuries to the body which are inflicted by an outside force . . . but not diseases which arise merely out of the performance of duty'] manifests the Committee's intent to limit coverage to deaths caused by traumatic injuries."  42 Fed. Reg. 23,254 (May 6, 1977).  Accordingly, the LEAA exercised its statutory authority to adopt regulations defining (1) "personal injury" to mean "any traumatic injury, as well as diseases which are caused by or result from such an injury, but not occupational diseases" and (2) "traumatic injury" to mean "a wound or other condition of the body caused by external force, including injuries inflicted by bullets, explosives, sharp instruments, blunt objects or other physical blows, chemicals, electricity, climatic conditions, infectious diseases, radiation and bacteria, but excluding stress and strain."  *Id.*  Which events are the result of "climatic conditions" and which are in the category of "stress and strain" is less than clear, since, by their very nature, climatic conditions, e.g., heat, humidity, and altitude, may often cause injury by imposing additional stress and strain.  We think a clue to the correct construction appears in commentary to the regulations, where the LEAA explained that "[c]limatic conditions include atmospheric conditions, such as dense smoke, as well as precipitation and intensely high or low temperatures."  42 Fed. Reg. 23,260 (May 6, 1977).  This commentary and the exclusion of "stress and strain" in the regulation strongly suggests that ordinary or routine conditions do not fall within "climatic conditions."    This is particularly clear with

respect to temperature, which the commentary to the regulation states must be "intensely high or low." *Id.* We note that this court has previously construed the regulations as requiring "unusually adverse" climatic conditions. *Juneau v. Dep't of Justice*, 583 F.3d 777, 783 (Fed. Cir. 2009).

This view is consistent with the overall statutory purpose. Compensation under the Benefits Act is linked to unusual circumstances. In broadening the statute to extend the benefit to include accidental deaths in the line of duty, the sponsor of the bill noted that the benefit was not health insurance, making clear that not all deaths occurring in the line of duty were compensable. So too, when Congress established a rebuttable presumption of entitlement for officers who died of a heart attack or stroke in 2003, it explicitly excluded situations involving routine activities, even if they were stressful or strenuous; "nonroutine" activity was required. 34 U.S.C. 10281(k)(1). In a 2012 House Report preceding an amendment of the statute to include rescue and ambulance workers, Congress again emphasized that "[t]he PSOBA program is not an insurance program, a worker's compensation program, or a remedial program, and never has been." H.R. Rep. No. 112-548 at 6 (2012).

The regulation, read in light of its history and the statute as a whole, requires a finding of nonroutine or out-of-the-ordinary climatic conditions for compensation. Although the Bureau noted the altitude and weather in which Agent Afolayan completed the training run and collapsed, it never determined whether the prevailing conditions were the type of unusual or out-of-the-ordinary climatic conditions that would qualify for compensation under the regulations. This was error.

## II

If the Bureau determines that Agent Afolayan's death was the "direct and proximate result" of an injury caused by "climatic conditions," then it must consider a second issue, which is whether sickle cell trait is appropriately

considered in determining whether another "factor . . . contributed to the death . . . to so great a degree" as unusual climatic conditions.  28 C.F.R. § 32.3.  Ms. Afolayan argues that the Bureau's consideration of Agent Afolayan's sickle cell trait is not permissible under the statute.  Specifically, Ms. Afolayan argues that "[i]t is a background principle in laws passed to compensate employees that an employer takes an employee as he finds him," and, because Congress is presumed to legislate with knowledge of existing common law, it must have "intended to maintain the background principles of worker's benefit laws that law enforcement agencies take their employees as they find them."  Afolayan Br. at 34–35 (internal quotation marks and citations omitted).  In other words, Ms. Afolayan argues that the statute incorporates what is known as the "eggshell plaintiff" doctrine in tort law.  The "eggshell plaintiff" doctrine provides:

> [A] negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct.

Restatement (Second) of Torts § 461 (Am. L. Inst. 1965); *see also* Restatement (Third) of Torts § 31 reporters' note cmt. b (Am. L. Inst. 2005) ("Every United States jurisdiction adheres to the thin-skull rule; more precisely, extensive research has failed to identify a single United States case disavowing the rule.").

However, we disagree that the Benefits Act can be read to incorporate the eggshell principle identified by Ms. Afolayan.  The decision of our predecessor court in *Morrow v. United States*, 647 F.2d 1099 (Ct. Cl. 1981), involved the LEAA's denial of death benefits in a case involving a fireman inhaling smoke and subsequently dying of a heart attack.  At the time, the LEAA recognized "traumatic injury

to be a 'substantial factor' in an officer's death when (1) the injury itself would be sufficient to kill the officer, regardless of the officer's physical condition at the time of death; or (2) the injury contributes to the officer's death to as great a degree as any other contributing factor, such as pre-existing chronic, congenital, or progressive disease." *Id.* at 1100–01. Our predecessor court affirmed the LEAA's decision because "[t]he obvious and overwhelming cause of death was heart disease—pre-existing, prolonged, and degenerative." *Id.* at 1103.

In light of *Morrow* and other similar cases,[3] the Department of Justice "began to interpret the Program's guidelines to exclude from benefits the survivors of public safety officer[s] who die of a heart attack or stroke while acting in the line of duty, arguing that the attack must be accompanied by a traumatic injury." 149 Cong. Rec. S2,855 (daily ed. Feb. 26, 2003) (statement of Sen. Patrick Leahy). In 2003, Congress overruled *Morrow*'s holding in the specific context of heart attack and stroke cases, closing the "loophole" that excluded scenarios where an injury occurred while the officer was on duty but did not trigger a heart attack or stroke until later, such as in the case of a police

---

[3]     *See Smykowski v. United States*, 647 F.2d 1103, 1106 (Ct. Cl. 1981) ("The public policy questions whether, and under what circumstances, heart attack deaths in the line of duty should be made compensable under PSOBA involve technical and fiscal judgments best left to Congress and the agency."); *Russell v. United States*, 231 Ct. Cl. 1022, 1025 (1982) (per curiam) (no benefit where officer had pre-existing condition and injury was caused by "stress and strain" inherent in police work); *Greeley v. United States*, 50 F.3d 1009, 1011–12 (Fed. Cir. 1995) (no benefit where firefighter died of heart attack after extinguishing a fire); *Juneau*, 583 F.3d at 782 (no benefit where "traumatic bodily condition was caused by stress and strain").

officer who suffered a fatal heart attack two hours after chasing and apprehending an escaped juvenile whom he had been transporting. *Id.* Congress revised the statute to create a rebuttable presumption that a heart attack or stroke suffered by a public safety officer constituted a personal injury within the meaning of the statute. Hometown Heroes Survivors Benefits Act of 2003, Pub. L. No. 108-182, 117 Stat. 2649–50 (codified at 34 U.S.C. § 10281(k)).

The heart attack presumption applies if the officer, "while on duty[,] engages in nonroutine stressful or strenuous physical law enforcement, fire suppression, rescue, hazardous material response, emergency medical services, prison security, disaster relief, or other emergency response activity" or "participates in a training exercise involving nonroutine stressful or strenuous physical activity" and suffers the injury during or within 24 hours of that activity. § 10281(k)(1)–(2). The presumption has since been broadened to cover "vascular rupture[s]" and may be rebutted if "competent medical evidence establishes that the heart attack, stroke, or vascular rupture was unrelated to the engagement or participation or was directly and proximately caused by something other than the mere presence of cardiovascular-disease risk factors." § 10281(k).

Significantly, the statute has not been amended to include the sickle cell trait within the pre-existing conditions exclusion. In other words, Congress did not make a more general change to the Benefits Act eliminating all pre-existing conditions as a relevant alternative cause. Under such circumstances, the judiciary cannot extend the statute to address issues left unaddressed by Congress. As the Supreme Court ruled in *Iselin v. United States*:

> The particularization and detail with which the scope of each provision . . . w[as] specified, preclude an extension of any provision by implication to any other subject. . . . What [is asked] is not a construction of a statute, but, in effect, an enlargement of it

> by the court, so that what was omitted, presumably
> by inadvertence, may be included within its scope.
> To supply omissions transcends the judicial func-
> tion.

270 U.S. 245, 250–51 (1926).

While we conclude that the eggshell plaintiff doctrine was not incorporated into the statute, this is not the end of the necessary inquiry. Although we reject the broad proposition that pre-existing conditions may not be taken into account, petitioner argues in particular that "the Bureau Director . . . improperly consider[ed] Agent Afolayan's benign sickle cell trait in denying his widow's claim for benefits" and that the decision should be remanded "[b]ecause the Bureau improperly considered sickle cell trait as a factor in denying recovery." Afolayan Br. at 30, 42. There is support for the view that such genetic traits should not be taken into consideration. The Genetic Information Nondiscrimination Act ("GINA") prohibits employers from "fail[ing] or refus[ing] to hire, or to discharge, any employee, or otherwise [] *discriminat[ing] against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee*." 42 U.S.C. § 2000ff-1 (emphasis added). This statute may be relevant to the Bureau's decision to deny death benefits on the ground that Agent Afolayan possessed the sickle cell trait if these benefits constitute "terms, conditions, or privileges of employment." *Id.* Although Ms. Afolayan raised the sickle cell issue generally, neither Ms. Afolayan nor the Bureau addressed the GINA. There is limited precedent interpreting the statute. Under these circumstances, we remand so that the Bureau may consider whether sickle cell trait should be considered to be a relevant alternative cause when such a benign trait is not disqualifying from employment in the Border Patrol. We decline to opine in the first instance whether the Bureau's consideration of Agent Afolayan's sickle cell trait violates the statutory

prohibition against discrimination based on genetic information.

## CONCLUSION

The Bureau failed to determine whether the climatic conditions surrounding Agent Afolayan's death were a "direct and proximate cause" of his injuries, and if climatic conditions were a cause, whether Agent Afolayan's sickle cell trait could properly be considered in evaluating alternate causation. We vacate the Bureau's decision and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

No costs.